**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* | ) | |
| MICHAEL CAMPBELL, | ) | |
| 507 K Street, N.E. #2 | ) | Civil Action No. |
| Washington, D.C. 20002 | ) | |
| | ) | |
| Plaintiff and Relator, | ) | |
| | ) | FILED UNDER SEAL |
| v. | ) | Pursuant to 31 U.S.C. § 3730(b)(2) |
| | ) | |
| CISCO SYSTEMS, INC., | ) | |
| 601 Pennsylvania Ave., N.W., #900N | ) | |
| Washington, D.C. 20004 | ) | DO NOT PUT ON PACER |
| | ) | |
| Defendant. | | |

**COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

**I.      INTRODUCTION**

1.      Relator Michael Campbell ("Relator" or "Campbell") brings this action on behalf of the United States and himself against his former employer, Cisco Systems, Inc. ("Cisco" or "Defendant"), to recover damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq*.

2.      Cisco has long enjoyed a lucrative role as one of the largest providers of network hardware, software, and support services to the United States military.  Over time, the Army alone acquired more than 500,000 pieces of Cisco hardware and held more than 5,000 individual maintenance contracts on that equipment.  From approximately 2001 to 2011, the Army had purchased approximately $4 billion in Cisco hardware and software.  During that time period, the Army and the other military service branches had generally purchased maintenance agreements, usually from the same Cisco reseller that had sold the original hardware.  This piecemeal procurement strategy, which resulted in the aforementioned 5,000-plus individual maintenance

contracts, resulted in, *inter alia*, no leveraged buying power despite the massive size of the military's installed bases of Cisco hardware and software.

3.      In 2009, Relator left his role as the Executive Officer/Chief of Staff ("XO") for the Army's Chief Information Officer ("CIO").  Cisco immediately recruited him onto its Public Sector Advisory Services team.  As he transitioned into his job at Cisco, Relator realized that Cisco business leaders who dealt with federal contracts were concerned that the company was losing, and would continue to lose, federal contracts because the Department of Defense's ("DoD's"), especially the Army's, procurement strategy was focused on lowest-price procurements.  He also determined that by virtue of its comprehensive inventory of the Army's installed base of Cisco products, Cisco could provide the most comprehensive view of the Army's inventory of Cisco equipment.  Based on his prior experience working for the Army, Relator believed that Cisco's inventory capability could be a platform for a robust relationship that would benefit both the Army and Cisco.

4.      Campbell worked with his team to develop a plan intended to lower the Army's expenditure on Cisco's equipment and services, as well as to curb Cisco's losses.  What followed was an ostensibly mutually beneficial Enterprise Services Agreement (the "ESA" or the "Army ESA") that consolidated the Army's maintenance contracts and was supposed to reduce its overall costs by providing access to Cisco's value-added services, such as enterprise engineering, network analyses, and strategic planning, worth more than $50 million.  These value-added services were intended to help the Army optimize its existing investment in Cisco equipment, prioritize information technology modernization efforts, and innovate with Cisco's technologies to meet the Army's mission needs.

5.      In 2013, while Cisco and the military worked to expand the Army ESA to the entire DoD, Cisco internally balked at its agreement to provide the value-added services as promised.  Still, Cisco went ahead with a DoD-wide Joint Enterprise Level Agreement ("JELA"), but, within the company, decided to substantially decrease the value-added services it provided under the contract.  Upon information and belief, this gambit resulted in approximate annual net profit margins that exceeded 75% of the contract.  In fact, even though it was a government contract, the JELA was Cisco's largest and most profitable contract worldwide.

6.      Campbell had concerns that, in order to increase Cisco's profits, Cisco was not honoring its commitments under the JELA.  He raised his concerns about the JELA delivery to every superior in his chain of command, vocally supported a formal complaint filed by one of his colleagues with knowledge of Cisco's fraud, and eventually submitted his own internal compliance complaint.  Subsequently, Cisco harassed, demoted, and ultimately terminated Relator.

7.      Despite Campbell's efforts to ensure Cisco met its commitments under the JELA, Cisco undermined those commitments to the United States by embarking on a scheme to maximize its profits by secretly depriving the DoD of the negotiated value of the JELA.

8.      This complaint details how, through the manipulation of the JELA's points system, the Defendant, by and through its officers, agents, supervisors, and employees, (a) knowingly presented or caused to be presented to the United States, through the DoD enrollees, false and fraudulent claims for payment under the JELA; and (b) knowingly made, used, or caused to be made or used, false records or statements to get a false or fraudulent claim paid or approved by the United States, through the DoD enrollees under the JELA.

9.      The Defendant, by and through its officers, agents, supervisors, and employees, authorized its various officers, agents, supervisors, and employees, to take the actions set forth below.

10.     As described below, the Defendant knowingly failed to disclose the manipulation of the JELA's points system, and such manipulation would have been material to the United States' decision to enter into the JELA and/or reauthorize or renegotiate option years of the JELA and/or make any payments to the Defendant pursuant to the JELA.

## II.     JURISDICTION AND VENUE

11.     This action arises under the United States Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

12.     This Court has subject matter jurisdiction pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331, and has personal jurisdiction over the Defendant, because it does business in this District.

13.     Venue is proper in this District under 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a) because Defendant operates and transacts business within this District.

14.     The facts and circumstances alleged in this Complaint have not been publicly disclosed in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party, nor in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation, or to the news media.

15.     Relator is an original source of the information upon which this complaint is based, as that term is defined in 31 U.S.C. § 3730(e)(4)(B).

16.     Prior to filing this action, Relator voluntarily disclosed to the United States the information on which his allegations are based.  Additionally, should there have been a public

disclosure of any aspect of these allegations prior to the filing of this action, Relator has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions.

### III.    PARTIES

17.    The real party in interest is the United States of America.

18.    Relator is a resident of the District of Columbia.  He joined the United States Army in 1996.  He was deployed on multiple combat and peace-keeping missions to Bosnia, Kosovo, Afghanistan, and Iraq as an assigned member of elite Army organizations, including Special Operations units and the 25th Infantry Division.  After his combat deployments, Campbell earned a Master's Degree in Public Policy from Georgetown University and served as a Military Legislative Assistant to United States Senator Conrad Ray Burns of Montana.

19.    In 2006, Campbell became the XO to Lieutenant General ("LTG") Steve Boutelle, the Army's CIO, and upon LTG Boutelle's retirement in or around 2008, to LTG Jeffrey Sorenson.  Campbell served in this capacity from 2006 to 2009, during which time he traveled to Army bases worldwide.  He co-authored the Army's Global Network Enterprise vision and strategy, which LTG Sorenson adopted and the Army Chief of Staff endorsed. Campbell separated from active duty in 2009, and continued to serve in the Reserves.  He retired from the Army Reserves in 2017 with the rank of Lieutenant Colonel.

20.    Following his departure from active duty in 2009, Cisco recruited Campbell to be the Director and Enterprise Architect of its Public Sector Advisory Services Division.  Cisco consistently rated Campbell as a top 1% performer.  He was employed by Cisco until his termination in June 2017.

21.     Defendant Cisco is a large provider of network hardware, software, and support services.  Cisco is headquartered in San Jose, California, but does business globally, including in the District of Columbia where it maintains an office at 601 Pennsylvania Avenue, N.W., #900N, Washington, D.C., 20004.

## IV.    RULE 9(b), FED. R. CIV. P. ALLEGATIONS

22.     Some of the information necessary to prove the allegations set out in this Complaint is exclusively in the possession of the Defendant.

23.     Each assertion herein that an allegation is made upon information and belief identifies a situation in which Relator has a reasoned factual basis to believe the allegation.

## V.    BACKGROUND TO FORMATION OF JELA

24.     Defendant Cisco is a leading provider of computer network hardware, software, and services to the United States military.  The hardware, software, and network support products provided by Cisco are referred to in Government parlance as Commercially Available Off-the-Shelf ("COTS") products because they are available to all retail consumers.  COTS products are governed extensively by Federal Acquisition Regulation ("FAR") Part 12, Acquisition of Commercial Items.  The FAR Part 12 implements the Government's preference to establish acquisition practices "closely resembling those of the commercial marketplace."

25.     Cisco conducts its government contracting through two divisions.  The Sales Division pursues business growth, and employees in that division must satisfy sales-volume requirements.  The Services Division fulfills the contracts that the sales team brings into the company.  Services Division employees are evaluated for their "margin contribution," meaning the delivery of services at the lowest possible cost in order to maximize profits.

26.     The Services Division has three relevant subcomponents: Technical Services, Advanced Services, and Cisco Consulting Services.

27.     The Technical Services Division, or "TS," provides "break/fix" support, meaning that it is purely responsible for fixing or replacing broken hardware and software.  TS provides SMARTnet services, which is Cisco's version of an extended service and replacement plan and is a COTS service that any Cisco customer can purchase.  The Advanced Services Division ("AS") and the Cisco Consulting Services Division ("CCS") are responsible for providing value-added services.  AS provides the lower-level value-added services, such as engineering.  CCS (before it was disbanded, as described herein) provided the modernization and innovation value-added services, such as management consulting, strategic planning, and business analytics.

## VI.     CISCO'S FCA VIOLATIONS

### a.     Creation of the Army ESA between Cisco (through a Partner) and the United States Army

28.     In or about 2009, in an effort to streamline its procurement processes and save money in response to tightening agency budgets, the United States began to favor a strategy called "Lowest Price Technically Acceptable" ("LPTA").  The strategy directed procurement authorities to buy the cheapest items that would meet a specified requirement.  The LPTA strategy hit particularly hard for COTS products; federal contractors, such as Cisco, had long cashed in on favored relationships and brand preference to sell tremendously expensive products, regardless of less expensive competitors that could accomplish the same task.  Cisco has always marketed its products as superior to those of its competitors, but that claimed superiority came at a premium price.

29.     At the time the Government was shifting its focus to an LPTA strategy, Campbell was the XO to LTG Sorenson, then the Army's CIO.  In that capacity, Campbell was responsible

for translating the CIO's intent into actionable tasks for the Army's staff members.  Therefore, he was very familiar with the Army's priorities in procuring network products and support.

30.     Campbell observed that the Army had maintenance agreements on only some of its Cisco hardware, and had no comprehensive inventory of it.  At that time, the Army was estimated to own more than 500,000 pieces of Cisco equipment and more than 5,000 maintenance contracts.

31.     Almost all of the Army's maintenance contracts were small or one-off contracts for "Cisco SMARTnet support services"; there were more than 5,000 of these contracts.  Nearly all of these SMARTnet contracts were between the Army and one of Cisco's many partner companies; few or none were with Cisco directly.  The Army paid more than $81 million per year for all of these contracts.

32.     Campbell resigned from active duty in March 2009, and was subsequently recruited by Brad Boston, then Senior Vice President of Cisco's Global Government Solutions Group and Cisco's former CIO.  Cisco hired Campbell as the Director and Enterprise Architect of its Public Sector Advisory Services Division (a division under the Cisco Services umbrella).

33.     Shortly after he went to work for Cisco, Campbell learned that, while the Army could not track all its Cisco hardware, Cisco could.  Cisco sales representative Terri Phifer had undertaken a project to create an Army "inventory collection and reporting system," which essentially was a database that tracked sales of all of the company's products to the Army, as well as the manufacturing and shipping information for the products.  Campbell saw Phifer's project as an opportunity to create a new relationship between Cisco and the Army that would benefit the Army by giving it comprehensive and coordinated network hardware and software support.  Such an arrangement would also allow Cisco to sell and service all Army hardware and

related software through such a coordinated system.  Campbell's senior supervisors, Vice Presidents Patrick Finn and Don Neault, were enthusiastic about the idea as a vehicle to help curb Cisco's repeated losses of contracts to cheaper manufacturers.

34.     In or about November 2009, Campbell took his idea to Brad Boston and his former boss, Steve Boutelle, who Cisco hired as its Vice President of Global Government Solutions Group after he retired from the Army.  Boston and Boutelle were both immediately interested in the concept as an opportunity for long-term growth and development of the relationship between Cisco and the United States military.

35.     On November 24, 2009, Campbell, Boston, and Boutelle had a private, informal meeting with then-Army CIO LTG Sorenson at the Ritz Carlton hotel near the Pentagon.  The Cisco executives proposed creation of a comprehensive arrangement to provide and service networking hardware and software to the Army.  They further proposed to provide a global inventory of Army-owned Cisco products and to consolidate the thousands of individual service contracts.  In addition, they told LTG Sorenson that Cisco could provide various "value added services," including engineering support, network strategy and optimization, management and optimization of classified networks, and systems training.

36.     General Sorenson supported the concept and told the Cisco team he would facilitate a follow-up meeting with Deputy CIO Mike Krieger, who would assume responsibility for the project on behalf of the Army.

37.     On or about December 10, 2009, Krieger and several other Army officials met with a Cisco team at the company's Washington, D.C. office.  Prior to the meeting, Cisco asked Krieger to "bring the Army's problems," and the meeting focused on white-boarding various strategies that Cisco could implement to resolve the issues that Krieger identified.  During the

meeting, Cisco and the Army discussed negotiation of a consolidated services contract to provide engineering and consulting help concerning the aforementioned issues.  Krieger said that the Army was very interested in the overall concept and requested a follow-up meeting in January 2010.

38.     On January 5, 2010, Campbell and other Cisco personnel met with Krieger and his team at the Pentagon.  In response to the various needs identified in the December 2009 meeting, the Cisco team pitched the concept of an all-inclusive, worldwide ESA (*i.e.*, the aforementioned Army ESA) to the Army.  The Army ESA was intended to (a) provide for the maintenance, troubleshooting, and quick replacement of the Army's worldwide installed base of Cisco networking equipment, (b) consolidate the individual maintenance contracts into a single agreement for SMARTnet coverage, and (c) provide consulting and engineering support.

39.     In addition to the inventory management and provision of SMARTnet services, under the ESA, Cisco offered to provide the Army with a series of "Value Added Enhancements" including "Advisory Services," "Network Optimization: Design/Software/Hardware Strategy," and "Advanced technology support."  The relevant page from a slide presentation Cisco made to the Army at this January 2010 meeting is reproduced here:



40.     Cisco sought the Army's commitment to allocate the time and resources necessary to gather all the information required to implement the Army ESA.  Krieger made this commitment and directed the Chief Integration Office ("CXO"), Enterprise Services Division to take the lead, and assigned Project Manager Katrina Tuel as the Action Officer.

41.     Over approximately the next two years, Cisco and the Army embarked on a series of planning meetings through which the parties worked to convince subordinate leaders responsible for network management to agree to the proposed Army ESA.  They also inventoried the Army's supply of Cisco products (because they would use the value of that installed base to price the Army ESA).

42.     On May 17, 2011, Don Neault, Cisco's Vice President for Advanced Services, presented the Army with market research material titled "Framework for an Enterprise Services Agreement for Cisco Services."  This presentation estimated Cisco's sales (through its partner companies) to the Army to be approximately $4 billion in hardware, in addition to the approximately 5,000 individual SMARTnet contracts.  Cisco showed as a benefit to the Army

that the Army ESA would "enable[] Cisco to provide value-added services on top of the foundational SMARTnet."  Cisco detailed the "value-added Cisco professional services" as including:

- Mission Enablement Service
- Architecture Alignment Service
- Cisco Network Optimization Service
- Focused Technical Support
- Training Conferences

43.     In June 2011, Cisco prepared an Enterprise Service Agreement - Cost Benefit Analysis ("CBA") on behalf of the Army, which touted the benefits of the Army ESA versus the status quo.  The CBA summarized the landscape at the time in the following manner:

> In our current government climate, fiscal resources are diminishing and organizations must explore every alternative for cost savings or cost avoidance.  It is imperative that the Army become more cost-conscious about its spending and proactively look for ways to improve efficiencies while maintaining network operations and improving security.  In order for the Army to effectively fund its IT infrastructure, efforts to leverage the Army's buying power for maximum cost avoidance and benefit must be considered.  A consolidated Cisco Enterprise Agreement supports these efforts and the Vice Chief of Staff's directive to realize $500M in Information Technology efficiencies.

Thus, the primary goal of the ESA was to effectuate the Army's "imperative" need for cost savings or cost avoidance.

44.     On or about May 12, 2012, Cisco prepared or edited a Justification for Other Than Full and Open Competition, Number JA12-091 for the Army.  (This Justification by a Senior Procurement Official is required when an agency determines there is only one responsible source for something it wishes to acquire.)  The Justification recommended executing a firm-fixed-price single award, indefinite delivery/indefinite quantity ("IDIQ") contract to Cisco or one of its certified Gold Partners using open market procedures.

45.     The Cisco/Army working group also negotiated the value of the installed base for the Army's equipment, which would be covered under the contract.  Using Phifer's inventory and tracking system and the data available from the Army, Cisco and the Army agreed on an installed-base value of $1.5 billion.  Upon information and belief (based on Campbell's review of documents and conversations with Cisco employees), Cisco knew, but did not disclose to the Army, that nearly half of the equipment factored into the installed-base value was low-cost and easily replaceable.  Thus, this hardware did not warrant service because it could be replaced less expensively than it could be repaired.  If Cisco had not accounted for that equipment, the installed base would have been closer to $750 million, and the cost of the Army ESA contract would have been cut nearly in half.

46.     Solicitation HC1028-12-R-0045 ("Solicitation HC1028") was subsequently issued on May 10, 2012.  It was a Request for Proposal ("RFP") with a 100% small business set-aside. The RFP specified that the Army sought proposals only from "authorized Cisco Federal Gold Partners," to which it would "award a firm-fixed price contract under [LPTA] evaluation criteria."

47.     Red River Computer Co., Inc. ("Red River"), one of Cisco's partners, submitted a bid in response to the RFP.  Red River had paid the United States $2.3 million in August 2011, to resolve numerous allegations of False Claims Act violations.  The violations involved, *inter alia*, a 2005 contract pursuant to which Red River agreed to provide Cisco SMARTnet services to the Army, but did not complete registration of the service with Cisco and subsequently obtained a partial refund without reimbursing the Army.  Later in 2011, the founder and former CEO of Red River, Breck Taylor, pled guilty to defrauding the United States and was sentenced to three years' imprisonment.

48.     While Solicitation HC1028 was pending, on May 21, 2012, the Army issued Modification 0001, which specifically broadened the scope of the RFP to "include value added services in addition to the maintenance coverage."  A section titled, "Task 6–Value Added Support" required the contractor to "provide value added support to include but not limited to engineering support, technical support, and consulting services to assist Army in making the best use of the emerging technologies."

49.     The Army ESA was awarded to Red River and executed as Contract No. HC1028-12-C-0034 on June 28, 2012.  The contract was a firm-fixed price contract valued at $578.2 million over five years with one base year, beginning on June 29, 2012, and four option years.

50.     The base year of the contract was valued at $65,890,874.02.  Cisco internally allocated 37.5% of the contract revenue to the provision of value-added services and created an internal business plan to recognize a minimum of 46% profit on those services.

51.     The Army repeatedly asked Cisco how much of the contract price would be allocated to value-added services, but Cisco refused to disclose that amount.

### b. Creation of Value-Added Points System to Implement Use of Value-Added Services in the Army ESA

52.     In the first year of the Army ESA, Cisco worked to help the Army use the value-added services for which it was paying.  However, shortly after the ESA was initiated, Campbell observed that the Army was not using the value-added services for which it had negotiated.  By the end of Contract Year 1, the Army had used so few services that, upon information and belief, Cisco recognized an approximately 90% profit margin on the portion of the contract allocated to value-added services.

14

53.     Fearing that the Army would not realize the value in the Army ESA because it was not using the value-added services, and thus, that it may not renew the ESA for subsequent contract years, Campbell met with Tuel to remedy this issue.  They recommended creating a Program Management Office ("PMO") and launching an initiative to educate the relevant government stakeholders and leaders about the available services.  Because the Army was not readily able to quantify the amount of value-added services it had available and the relative worth of each service, Campbell and Tuel suggested that Cisco develop a "points system" and associated "gas gauge" to use and monitor the value-added services.  (The "gas gauge" would be a visual aid that detailed the number of points the Army had spent in a contract year, as well as the number of points remaining for that year.)

54.     Campbell and Tuel proposed the points system to help the Army visualize the availability of, and to use, its value-added services under the ESA.  Later, however, Cisco manipulated the points system to provide fewer services to the Army and increase its profit margins.

55.     Under the points system, Cisco allotted the Army a certain number of points each year, which the Army redeemed to acquire the value-added services pursuant to the ESA.  Under this system, Cisco assigned the point value to each value-added service, and the Army would have to weigh the value of one desired service against another in order to determine how to use its points.

56.     James Lien, Cisco's Services Delivery Executive for the Army ESA, directed the point-system project, and Campbell was on the development team.  However, Cisco consultative analyst Josh Dries was the individual ultimately responsible for determining how many points to allocate to the Army and to assign to each value-added service.  Dries developed the "point

system" by using backward math: he started with the portion of the total contract value that Cisco had internally allocated to value-added services, then determined the cost of typical value-added services and how many of those services could be performed with the allocated funds, while still protecting Cisco's targeted 46% profit margin.  Dries then converted the number of those value-added services into points.

57.    Even as Cisco developed the points system, a number of Cisco executives were displeased by the notion of increasing the Army's use of value-added services because the value-added allocation (prior to the points system) was so profitable.  For example, Lien, who was responsible for the points-system project, opposed the idea of points because he knew the implementation of such a system would cut into Cisco's profit margins, as it would result in the Army's increased use of value-added services, even though those services were a reason that the Army was induced to contract with Cisco

58.    On or about October 30, 2013, Cisco made a presentation titled "CISCO Enterprise Service Agreement Value-Added Services: Proposal to Create a CISCO Enterprise Project Management Office" to the Army's Enterprise Services Division, led by Army Colonel Fritz McNair.  As evidenced in the foregoing slide, the presentation introduced the concept of a Cisco Enterprise Program Management Office ("EPMO") Point System, including a breakdown of how many points had been allocated already for that calendar year under both the Advanced and Consulting Services Divisions.



59.     On or about October 30, 2013 (*i.e.*, the date of the above-referenced proposal presentation), Cisco approved creation of the EPMO and implementation of the points system. The Army and Cisco agreed to implement the points system at the beginning of the second contract year, *i.e.*, Option Year 1 ("OY1"), which began on June 29, 2013, and had a contract value of $90,691,522.97.  Internally, Cisco allocated approximately $34,009,321, or 37.5% of the contact value, to the value-added services by Cisco.

60.     As described in the slide below, Cisco used a six-step process to assign points for each value-added service; the process started with Cisco confirming whether each project was the appropriate size and scope to qualify as a value-added service, assigned a points value along the way, and ultimately was supposed to execute the mission at hand.  Cisco, however, never

17

disclosed the value of the project in dollars to the Army, but insisted on communicating with the Army about costs only in terms of "points."



61.     In OY1, with the points system implemented, the Army increased its use of the value-added services and consumed approximately half of the points available under the Army ESA.  Even with the increased usage, Cisco recognized approximately 75% profit on the portion of the revenue it attributed to value added services.

62.     During OY1, Cisco learned that the ESA would not be renewed.[1]

---

[1] On December 18, 2012, the Small Business Administration protested the award of the Army ESA to Red River because, *inter alia*, it was too large to properly qualify as a small business. That protest was upheld, and Red River was disqualified from the contract because the Solicitation for the ESA had specified 100% small-business participation.  *Size Appeal of Red River Computer Co., Inc.*, SBA No. SIZ-5512 (SBA Office of Hearings and Appeals, November 1, 2013).

**c. Development of Joint Enterprise Level Agreement to Replace the Army ESA**

63.     In or about October 2013, around the time that the Army and Cisco learned that the ESA would end, Tuel approached Campbell about forming a Joint Enterprise Level Agreement ("JELA") between the Department of Defense and Cisco, to the exclusion of Cisco's partners.  Campbell took the idea to his superiors, and they immediately embraced it.

64.     In or about November 2013, Cisco made a presentation to the Army about a potential JELA for the entire DoD (and not just the Army).  Krieger, the Army Deputy CIO who had been primarily responsible for the ESA, and previously worked for the DoD's CIO, was particularly eager to see the operational success of the ESA replicated at the DoD level.  Krieger insisted that Cisco bid on the contract directly, rather than rely upon a partner entity.  With an assurance from Cisco in place, Krieger offered to have the Army act as the sponsoring agency and to push the concept of a JELA to the DoD CIO.

65.     In or about December 2013, the Army and Cisco again entered into working groups to develop a program which could be applied to the whole DoD.  While it had taken the Army and Cisco approximately two years to develop the Army ESA, the JELA was rushed through in approximately six months.  The JELA would be processed through the Defense Information Technology Contracting Organization ("DITCO"), which is a branch of the Defense Information System Agency ("DISA").  DITCO assigned Keith Nakasone, the technical director of the procurement directorate, to be the JELA project lead.

66.     Although value-added services were a primary focus of the JELA negotiations from the beginning, upon information and belief, Cisco and the DoD agreed that the original JELA contract would only be for SMARTnet services.  Because SMARTnet was a COTS product, it was much faster to get the JELA through the DoD procurement system with just that

product than it would have been for a service-based contract.  However, soon after the JELA was

awarded, it was to be modified to include the value-added services.  Thus, even though they

would not be expressly stated in the original contract, the JELA was negotiated and priced with

the value-added services included.

67.     In or about April 2014, while the DoD and Cisco were still developing the

contract, Phifer made an internal presentation to Pat Finn, Cisco's head of the US Public Sector,

and Finn's staff entitled "Executive Briefing on Game of Thrones for Decision."[2]  As the slide

(below) from the presentation indicates, Phifer expressly recognized, "Value-added services

expected as part of the solution but not included in the requirement."



---

[2] "Games of Thrones" was the internal code name assigned to the project to protect the JELA
from being disclosed or leaked before it was finalized.  The name was a joke because the
television show by the same name involves seven entities fighting each other and the
development of the JELA caused a great deal of internal discord within the different factions at
Cisco.

**d.  Cisco's Plan to Protect its Massive Profit**

68.     Despite the military's primary goal of *reducing* spending, Cisco's management realized that the JELA could actually *increase* its net revenue from the military.  To that end, Cisco set targeted profit margins of 76.25% on SMARTnet services and 46% on the Advanced Services (another name for the value-added services), for a blended profit margin of 64.34% on the $1.8 billion contract.  Based on these figures, Cisco projected that it would recognize an increase in revenue of $103,154,321 over the life of the contract, *i.e.*, from $546,845,679 to $650,000,000 in five years.  Phifer made another internal presentation titled "Game of Thrones DoD ESA Overview," which set out Cisco's expectations:



**e.  Development of "Bands" to Establish Contract Price and Point Allocation**

69.     Even though the value-added services were omitted from the original contract to ensure quicker processing of the JELA, Cisco and the DoD began discussing how to implement those services once the agree-upon contract modification containing the value-added services was put in place.  The DoD was familiar with the "point system" used in the Army ESA and

expected the same to be carried over to the JELA.  However, Cisco's executives knew that the "points system," which had been successful under the ESA, would cause the enrolled components to use the value-added services under the JELA.  If all of the enrolled components used all of their points on the promised value-added services, Cisco's huge profit margins would decrease.

70.     Cisco's primary concern was the Army, which would be the single largest enrolled component under the JELA.  The Army was slated to use all its allocated points in the first contract year of the JELA, mostly because it had become comfortable with the system through the previous ESA.  But, even more alarming to Cisco was that the Army's covered installed base was expected to increase significantly over the following years; as its on-going service contracts expired and it acquired new hardware, the Army expected Cisco to award it more points, consistent with its larger installed base.

71.     Cisco's JELA team, which included Dries, Phifer, Lynn, Lien, Andy Houck, and supervisor Mike Solomita, held meetings in early 2014 to discuss how Cisco could respond to the Army's increasing installed base (which would result in an increase of points and, thus, additional value-added services to be provided by Cisco), but still protect its expected profit margins.  Cisco's development team decided to use a system of "bands" to price each JELA enrollee's contract.

72.     Under this system, Cisco created various "bands."  Each band set forth different ranges of installed base values.  Cisco assigned each enrollee to a particular band depending on the value of its installed base at the time it enrolled.  For example, the smallest band covered an installed base value that ranged from $1,000,000 to $1,250,000, and the largest band covered an installed base value that ranged from $5,300,000,000 to $7,299,999,999.  (An enrollee's installed

base value was calculated using certain metrics, or, if metrics were not available, through negotiations.)

73.     Cisco presented the bands to the DoD only as a means to determine the contract price for each enrolled component.  Cisco never specifically told the DoD that it would also use the bands to determine the number of value-added points available to an enrollee, nor did it disclose to the DoD how many points would be associated with a particular band.  Moreover, despite being asked directly on various occasions, Cisco refused to disclose to the government the actual dollar value of a point in the "points system."

**f.  JELA Contract is Solicited, Awarded and Amended to Include Value-Added Services**

74.     As with the Army ESA, DITCO submitted a Justification for Other Than Full and Open Competition for the JELA contract.  In the Justification, a Senior Procurement Executive stated that using any vendor other than Cisco or one of its Gold Partners "is not in the best interest of the government at this time in terms of both costs and efficiency."  In other words, the DoD virtually guaranteed the contract to Cisco because the DoD felt that Cisco was the most cost-effective option to obtain the services that it desired.

75.     Having completed the planning phase with Cisco and obtained the above-referenced Justification to limit the contract to Cisco or a Gold Partner, DITCO formally issued a Solicitation for Commercial Items Number HC1028-14-R-0029 on July 8, 2014, as an unrestricted request for proposals with a return date of July 22, 2014.[3]

76.     On September 18, 2014, DITCO formally awarded the JELA to Cisco as contract number HC1028-14-D-0003 (*i.e.*, the JELA).  The JELA describes itself as "an Indefinite

---

[3] DITCO first issued solicitation HC1028-14-R-0014 on April 28, 2014, for the JELA.  That RFP was cancelled on May 20, 2014, due to technical issues and reissued as described herein.

Delivery/Indefinite Quality (ID/IQ) contract utilizing firm fixed price type delivery orders issued in accordance with Federal Acquisition Regulation Subpart 16.5 – Indefinite Delivery Contracts." The Maximum Contract Value is $1.875 billion over the nine-month base period and four one-year options. The Army enrolled at the inception of the contract as an anchor enrollee.

77. The Period of Performance for the JELA consisted of a Base Year from September 18, 2014, to June 17, 2015, with Option Years 1, 2, 3, and 4 beginning on June 18, 2015, 2016, 2017, and 2018, respectively.

78. On October 10, 2014 – less than a month after the contract was awarded to Cisco –DITCO issued Modification P00002 for the express purpose of including the value-added services that had been negotiated as a primary function of the JELA. Modification P00002 was made "to incorporate Cisco SMARTnet support details and In Process Reviews (IPRs) at no additional cost to the Government."

79. The Modification identified three types of services Cisco would provide under the JELA: (1) Category 1 was "Support Available to Enrollees without Limit;" (2) Category 2 was "Support Available to All Enrollees in Limited Quantities;" and (3) Category 3 was "Support Available to All Enrollees in Limited Quantities and Managed via Points." The value-added services managed through the points system were thereafter referred to as "Category 3 services."

80. Once Modification P00002 was in place, Cisco implemented its plan to use the pricing bands as a means to allocate points for the Category 3 services. Having created the bands specifically to limit the points available to the Army, Cisco set band limits such that the range for the higher-value bands was much wider than the smaller-value bands. For example, the lowest band had the smallest range of just $250,000 (*i.e.*, $1,000,000 to $1,250,000). The mid-value bands had ranges of $100-150 million (for example, $350,000,000 to $449,999,999). But the

highest bands had ranges in the billions, such as the highest band with a range of $2 billion ($5,300,000,000 to $7,299,999,999).  The varying band widths insured that enrollees with smaller installed bases could move between ranges more quickly and therefore have access to more points for the value-added services that they needed.  The enrollees with larger installed bases – namely, the Army – would get the same amount of points even if their installed base grew by over $1 billion.

### g. Manipulation of the Value-Added Services Points System to Reduce Services and Increase Profit Margins

81.     As JELA got under way, Cisco's CEO, John Chambers, retired, and a new group of leaders stepped in.  Cisco's new executives took the lead on the JELA contract.  Senior Vice President Joe Cozzolino (responsible for oversight of all services – SMARTnet and value-added), Senior Vice President Bryan Palma (responsible for value-added engineering services), and Vice President Solomita (Public Sector Advanced Services) led the new team.  That left Lien as the lone carry-over executive from the ESA project.

82.     Cisco senior management directed the new team to maximize profit margins on the JELA or risk termination.  Cisco also directly tied the executives' personal compensation to the JELA profit margins, so the team had personal incentives to maximize profits by minimizing Cisco's cost of performing the value-added services.

83.     Therefore, the new management began to renege even further on Cisco's commitment to provide value-added services it had delivered under the Army ESA, even though those services were a major factor underlying DoD's interest in entering into the JELA.  The executives pressured Lien to save money and perform even fewer of the value-added services.  Lien, who opposed the point system to begin with, proposed reconfiguring it as a means to reduce the amount and cost of value-added services provided under the JELA.

84.     On or about October 17, 2014, Lien sent an email in which he acknowledged that Tuel, on behalf of the Army, "wants to be able to determine/communicate the value of the points." Campbell attended the subsequent meetings during which Lien and Solomita, among others, said that they would not tell the Army the value of a point, despite the repeated requests by Army personnel.

85.     Cisco leadership developed strategies to reduce the value of the value-added services provided to the government in order to protect its profits. In implementing these strategies, Cisco directed its employees to: (a) artificially mark up the cost in points of value-added services; (b) stop recommending expensive, involved projects, even when Cisco was fully capable of performing the services, and the JELA revenue was sufficient to cover them; and (c) recommend low-cost, non-complex projects, and also continue to perform basic tasks (*e.g.*, like cyber audits or network resiliency tests). Cisco used these strategies to manipulate the point system to burn through the points more quickly.

86.     In some ways, the strategies that Cisco developed were simple and amounted to dumbing-down Cisco's capabilities. Cisco assigned consultants to each enrollee who were tasked with identifying the range of services Cisco could offer to resolve an issue. Cisco's new leadership team (including Lien, Solomita, Palma and Cozzolino) told these consultants, in meetings Campbell attended, to stop recommending complex, long-term projects as Category 3 services, even if those services would be the preferred resolution for an issue, and instead recommend lower-cost projects. The leadership team further encouraged the Cisco consultants to recommend only higher-cost projects once a component used all of its allocated points for the year, thereby forcing the enrollee to pay for expensive projects separately from the JELA.

26

87.     The more direct manipulation of the point system was more complex, but had the highest rate of cost-savings for Cisco and value-reduction for the DoD components.  By using bands (as described in paragraphs 71-72) to allocate points, Cisco effectively locked the largest enrollees into a fixed number of points.  While that practice limited Cisco's cost exposure, the corporation wanted to protect profits even more, so it began holding meetings regarding how to manipulate the value of points allocated to each project in order to use up the points more quickly.

88.     Cisco executives – including Lien, Solomita, Palma and Cozzolino - instructed project sponsors to conduct a "level of effort" analysis–which would include an analysis of how long the project would take, how complex it was, and what types of skill sets would be required to complete the project – whenever a new Category 3, or value-added, service project was requested.  With that information in hand, the project sponsors were given guidance to determine the actual cost of the project and corresponding point value of the project – just as they had done under the ESA.  Under the JELA, however, the project sponsors were instructed to mark up the point value before providing it to the component for approval.

89.     There was no legitimate basis for the instruction to increase the point cost other than to burn through the enrollee's points more quickly, which would then allow Cisco the opportunity to sell value-added services to the DoD enrollee at an additional cost outside of the JELA.  The effect of the fraudulent mark-up was to reduce the number of services Cisco provided to each enrollee, thereby depriving the enrollee of the value of its contract, and to further increase Cisco's profit margins on the value-added services.

90.     Every Mission Support Request provided to an enrollee with an artificially marked-up point value is a false record made by Cisco.

27

91.     In addition, Cisco's executives instructed the Project Management Office to change the classification of new Mission Requests in order to increase the point cost.  All Category 3 services were classified as optimization, modernization, or innovation, and the classification of the project directly correlated with point cost, with innovation projects considered the most expensive in terms of points.

92.     Optimization projects had the lowest point values.  Optimization projects primarily focused on fixing an existing investment in Cisco equipment, or tuning it up before it broke.  Optimization projects were mostly reactionary services and were provided by the AS Division.

93.     Innovation projects had the highest point values.  Innovation projects focused on creating new capabilities or anticipating future requirements needed to successfully execute a mission and working on strategies to meet those anticipated needs.  Innovation projects were considered visionary or strategic services and were provided by the more senior and expensive consultants, architects, and distinguished engineers from the AS and the original CCS Divisions.

94.     Modernization projects had mid-level point values and included both optimization and innovation.  These projects primarily updated existing investments in anticipation of future needs.  Modernization projects were provided by AS and CCS personnel.

95.      Thus, Cisco altered the classification of very simple optimization or modernization projects to appear as though they were creative and complex.  Cisco used this illusion as a justification to increase the point cost.

96.     For example, under the JELA, the point cost associated with a Network Resiliency Analysis (a basic service offered to Cisco's commercial clients for approximately $50,000) increased three-fold from the original ESA.  As demonstrated in the slide below (from

a presentation during an August 2014 EPMO meeting between Cisco and the Army), under the

Army ESA, a Network Resiliency Analysis ("NRA") would cost the Army one point.



UNCLASSIFIED // FOUO

# Pending Decision Review



| New Mission Request | Pts | Domain | Region |
|---|---|---|---|
| Title: M4.13 Asset Lifecycle Planning and Analysis – Arkansas ARNG | 3 | IT Operations: Stabilization / Optimization | CONUS |
| Title: M29.9 Tennessee Army National Guard (ARNG) – Network Resiliency Analysis (NRA) | 2 | IT Operations: Stabilization / Optimization | CONUS |
| Title: M29.10 Wyoming Army National Guard (ARNG) – Network Resiliency Analysis (NRA) | 1 | IT Operations: Stabilization / Optimization | CONUS |
| Title: M70 Colorado (CO) Army National Guard (ARNG) – Quality of Service (QoS) | 1 | IT Operations: Stabilization / Optimization | CONUS |
| Title: M71.1 USARC – Unified Capabilities Adoption Services | 2 | IT Innovation: Unified Capabilities | CONUS |
| Title: M71.2 USARC – Unified Capabilities Strategy Consulting | 2 | IT Innovation: Unified Capabilities | CONUS |
| Title: M71.3 USARC – Unified Capabilities Design Support | 2 | IT Innovation: Unified Capabilities | CONUS |
| Title: M77 USARPAC VTC/IP Network Audit | 3 | IT Innovation: Security | PAC |
| Title: M79 RCC-E Jabber Support | 3 | IT Innovation: Unified Capabilities | EUR |
| Title: M81 NETCOM KT ASA 5585 | 1 | IT Innovation: Unified Capabilities | CONUS |
| Title: M85 – ATEC – Cisco Asset Discovery Support | 1 | IT Operations: Analytics | CONUS |

© 2014 Cisco Systems, Inc.. All rights reserved. Do Not Distribute.

25

97.     The following slide (from an EPMO presentation to the Army in January 2015) demonstrates that, at the beginning of the JELA, the cost for an NRA had increased to two points instead of one.



98.     As the following slide shows, only two years later, at the February 2017 monthly meeting between the Army and the EPMO, Cisco again increased the point cost for a virtually-identical NRA to three points.



**h.  Cisco Dismantled the Department Responsible for Value-Added Services Under the JELA**

99.     In or around November 2014, with the JELA fully under way, Campbell realized that Cisco was not properly staffing CCS, the division that provided higher-point value, more complex Category 3 services to the JELA enrollees.  Campbell monitored the performance of the contract for several months and confirmed the validity of his concern that Cisco was not providing the Category 3 services as promised.

100.     In or about late 2015, Campbell reported his concerns to Lien, Solomita, Cozzolino, Palma, and others.  After a series of telephone calls and conversations, Solomita directed Campbell to stop complaining or risk losing his job.

101.     In or around November 2015, CCS director Ricky Santos told Campbell that Cisco made a business decision to stop providing high-end consulting entirely and to disband CCS, which performed the JELA value-added services.  Cisco proceeded with the disbandment despite the fact that at the outset of the JELA, Cisco internally recognized that it needed at least thirty full-time equivalent CCS consultants to fulfill its obligations for value-added services, as reflected in an internal presentation to the leadership of CCS.

## Executive Summary

- The Army Enterprise Services Agreement (ESA) continues to be a game changing opportunity for Cisco and foundational to Cisco Consulting
  - Army Operation secured wide area, campus, and security business over last two years
  - So successful that it is being expanded to DoD – **NO GREATER METRIC OF PERFORMANCE**
- The Cisco | DoD Joint Enterprise Level Agreement (JELA) will be the largest transformational deal in Public Sector history, creating an **opportunity for Cisco to pro-actively grow a forecasted FY15 $1.07B DoD Cisco business** leveraging a strategically placed Consulting team
- DoD Expectations – JELA will be the "Army ESA enhanced"
  - 100% SMARTnet coverage with fixed pricing for each Enrollee (any DoD MILDEP or Defense Agency)
  - Limited value added services:
    - Classified network support, training, 4-hour device replacement
    - Cisco Professional Services (Cisco Consulting, Advanced Services, Practices)
- JELA Deal Overview
  - $1.875B total revenue / $512M in professional services revenue opportunity over 5 years (full enrollment)
  - $20.5M CCS bookings opportunity in first year of full enrollment / $102.5 over 5 years (full enrollment)
  - Represents the opportunity 109% increase over existing CCS DoD business
  - Will require ~30 FTE CCS consultants with full enrollment

102.     In another internal document titled "Consulting Resources Required for JELA Customer Requirements," Cisco admitted during the negotiation of the JELA contract that it had "[s]ignificantly underestimated [the] need for consulting skillsets and CCS resources" in its delivery of the ESA, and it "[a]nticipate[d] [an] even greater demand for strategic-level professional services" under the JELA.

103.     Despite its recognition that CCS and its consultants were critical to providing the required value-added services, Cisco proceeded to disband CCS, which made it impossible for Cisco to perform the higher-level value-added services under the contract.

104.     On November 11, 2015, Cisco held a self-congratulatory social event to celebrate the JELA contract.  Cisco excluded several vocal opponents of the proposed point value manipulation from the event, but still invited Campbell because of his status in the organization. At the event, after Senior Vice Presidents Cozzolino and Palma spoke about the new contract, Campbell objected to Cisco's decision not to provide the government the value-added services for which the government had contracted.  Campbell raised his hand and asked, "Now that the

contract is in place, how are you planning to deliver on what we've promised the Department of Defense?"  Palma responded before Cozzolino and stated in front of a room of approximately 50 people, "We just aren't going to.  We're just going to offer basic engineering services instead of all that more expensive other stuff."

   **i.   Point Manipulation Resulted in a Massive Windfall for Cisco**

   105.   Eligible DoD components in addition to the Army quickly signed up for the JELA.  As of mid-2017, all but one eligible component have enrolled.  In May 2017, Cisco reported that it allotted 568 points across all the various components for that contract year, and 562 had been used.  That same year, it internally reported profit margins of approximately 67.6% on the value-added services – even more than Cisco had hoped to realize.

   106.   In or about April or May 2017, Cisco Delivery Manager Brian Gatti told Campbell that he attended a planning meeting at the Cisco Public Sector Headquarters in Herndon, VA, with Lien wherein Lien boasted about JELA's high profit margins and told the JELA Delivery Team that that the points system had become a "self-licking ice-cream cone." This phrase is government-insider parlance, as described in *Wikipedia*, for "a self-perpetuating system that has no purpose other than to sustain itself."

   107.   Upon information and belief, if DoD or any enrolled component knew that Cisco was artificially increasing the point cost to burn through points more quickly, while spending less money and providing only a fraction of the contracted-for value-added services, DoD and/or the enrollees would have refused to accept the point values assigned to new mission requests, would have demanded more points, or would have opted out of the JELA and just purchased the services on an as-needed, Lowest-Price-Technically-Acceptable basis.

108.     By falsifying the quantity, quality, and value of the Category 3 services it
provided, Cisco defrauded, and continues to defraud, the United States for hundreds of millions
of dollars through the JELA every year.

## VII.   RELATOR'S EFFORTS TO REPORT FRAUD AND DEFENDANT'S SUBSEQUENT RETALIATION

109.     Beginning in 2015, Campbell spent nearly two years trying to convince Cisco not
to manipulate the JELA to the government's detriment.  Cisco ignored and rebuffed his efforts
and threatened him with termination if he did not quietly accept Cisco's fraudulent conduct.  As
a direct result of his efforts to stop the conduct that violated the False Claims Act, Cisco
terminated Campbell's employment, effective June 16, 2017.

110.     As detailed above, Campbell had been an integral member of Cisco's team
responsible for conceptualizing the idea of the initial Army ESA, obtaining approvals for the
Army agreement, implementing it to great operational success in its base year and OY1, and then
transitioning to the DoD-wide JELA in 2014.

111.     Between April and May 2015, after Cisco secured the JELA contract with the
Army, Cisco assigned Campbell to a new program within CCS called "CEO Prime."  In his CEO
Prime role, Campbell developed a partnership agreement between Cisco, United Health Group,
and Optum (hereinafter referred to as the "Optum Partnership") to promote technology
innovation in healthcare.  Despite his new assignment, Campbell nonetheless remained involved
in Cisco's JELA efforts due to the key role he played in securing the contract, as well as his
intimate familiarity with the contract and Cisco's clients.

112.     Even though he primarily was working on the Optum Partnership, because of his
role in creating the initial point system under the ESA, colleagues who attended point
manipulation meetings came to Campbell to address their concerns that the government was

34

being harmed by the decreasing value of the points.  Based in part on his experience with the ESA and JELA, Campbell believed that if the DoD learned that Cisco reconfigured the point system to reduce the provision of value-added services and increase its profits, the DoD would terminate the JELA because it would realize how much it was over-paying for value-added services that it was not receiving. Under those circumstances, the JELA contract would not save the DoD any money.

113.    Thus, when Campbell learned in late 2015 that Cisco would disband CCS, he strenuously objected and continued protesting internally regarding his concerns about the delivery of the value-added services under JELA contract.

114.    In October 2015, Campbell told then-Senior Director for CCS Ricky Santos that without CCS, Cisco lacked the manpower and expertise to deliver the Category 3 services as required under JELA.  As Campbell became increasingly aware of the manner in which Cisco manipulated the points system – that is, the system essentially become a slush fund for Cisco to charge what it wanted for whatever Category 3 service was requested – he increasingly objected to Cisco's management of the JELA and the reduced manpower that Cisco allocated to performance of the contract.

115.    Specifically, on or about the following dates, Campbell told his superiors, amongst other things, that he believed Cisco's refusal to provide the level of value-added services promised to the DoD constituted fraud: (1) November 11, 2015, during an internal meeting with Solomita, Palma, and Cozzolino; (2) numerous times between September 2014, and April 2016, to Phifer (CCS Director and previously Cisco's Army Client Services Sales Executive); (3) December 2015, to Solomita, who advised him to stop protesting Cisco's actions; (4) between April and May 2016, to Shannon Leininger, Cisco's Federal Civilian Sales

Operations Director; (5) April 2016, to Boutelle, who told Campbell to "let it go," or else he would jeopardize his job; (6) April 4, 2016, to Bac Tran, Cisco's Director of Service Sales, who told Campbell that Solomita regularly boasted about Cisco's profit margins on the JELA and the Department of Veterans' Affairs Enterprise Services Agreement ("VA ESA");[4] and (7) August 6, 2016, during a business compliance and ethics group conference call to Susan Du Becker and Greg Lynch, then-Director and Senior Director of Cisco's Ethics and Compliance, respectively.

116.    Following the official disbandment of CCS in January 2016, Cisco temporarily maintained Campbell's role in CEO Prime under the Executive Vice President in charge of World Wide Sales, to enable him to finish negotiating the Optum Partnership.

117.    From January 2016 through November 2016, Campbell negotiated the Optum Partnership and also continued to work on JELA-related assignments.  During this time, Campbell continued to object to, and internally protest, Cisco's fraud under the JELA.  In April 2016, Diane Gongaware, the Vice President of Cisco's U.S. Public Sector Services Sales, called Campbell a "rogue agent" in front of a group of his peers due to his reports about Cisco's misconduct under the JELA and VA ESA.  Gongaware made clear that Campbell would not work on the VA ESA, given his repeated internal reports.

118.    In May 2016, Cisco undertook a purported internal investigation in response to a complaint filed by Eliza Fox, another Cisco employee and Campbell's partner.  Fox's complaint related to mismanagement of the JELA, particularly regarding value-added services.  In the course of Cisco's investigation, in May and June 2016, Campbell provided truthful statements

---

[4] The Department of Veterans' Affairs ("VA") entered into an independent agreement with Cisco nearly identical to the Army ESA because the VA is not under the umbrella of the DoD, and therefore was not eligible to enroll in the JELA.

about Cisco's refusal to deliver the promised and required level of value-added services and its mismanagement of the contract in general.  Campbell's statements supported Fox's complaint.

119.    On or about August 17, 2016, Campbell submitted a formal ethics and compliance complaint that described Cisco's fraudulent conduct under the JELA and VA ESA to Lynch, Du Becker, and Laura Ellis, the leaders of Cisco's ethics and compliance team.

120.    On or about September 8, 2016, Du Becker concluded that Campbell's complaint exposed a clear ethical violation, but purportedly no contractual compliance issue.  She then closed Cisco's investigation on Campbell's internal complaint.  However, Cisco continued to communicate with Campbell about his statements in support of Fox's complaint.

121.    Subsequently, after Campbell continued to object to Cisco's misconduct regarding the manipulation of the points system and provision of value-added services, Cisco removed Campbell from all JELA assignments and directed him to work exclusively on the Optum Partnership.

122.    Cisco completed the agreement for the Optum Partnership in November 2016. Cisco created a new division, the Optum Partnership and Healthcare Innovation Center ("Optum Center") to support the agreement.  Although Campbell played an integral role in securing the Optum Partnership, Cisco refused to assign him a position at the Optum Center, and instead forced him to remain in a nebulous "temporary" position within CEO Prime.

123.    At the same time that Cisco refused to allow Campbell to continue working at the Optum Center, multiple Cisco employees (including Boutelle, Phifer and Lynch) who worked on the JELA told him that he was "at risk" because of his continued reports about Cisco's misrepresentations and its inflated profit margins from the DoD's payments to Cisco for work it refused to perform.

124.    In January 2017, the same month that Campbell submitted his finalized written statements in support of Fox's complaint, and thereby completed his participation in the internal investigation, Cisco continued its retaliation against Campbell by forcing him to either accept a downgraded position as an Executive Business Development Manager, along with a pay-grade and title reduction, or face termination.

125.    At the time Cisco offered Campbell the downgraded position, Cisco already knew it would soon eliminate the position pursuant to a "limited restructure" the Company planned to execute in the following months.

126.    In late February 2017, several senior leaders of the U.S. Public Sector, including Solomita and Gongaware, publicly expressed at an off-site senior leadership meeting that they were unhappy with Campbell's supposedly "confidential" ethics complaint and his history of whistleblowing at Cisco.

127.    After Campbell accepted the new, downgraded position, Cisco further retaliated against him in February 2017, when it sought his resignation.  Cisco, through its attorney, requested a settlement demand from Campbell and specifically stated that it was interested in a settlement "that would result in Mr. Campbell's departure from employment with Cisco."  Cisco, however, rejected the demand from Campbell and, as a way to move him out of the company, opted instead to carry out the "limited restructure" that it had previously planned for Campbell's position.  Cisco terminated Campbell's employment effective June 16, 2017.

128.    Prior to his termination, Campbell's former supervisor, Mark Sanders, told him that the "real reason" for his termination was the negative comments Cisco leaders made about him; Campbell understood this to concern his ethics and compliance complaints.

**COUNT I:**
**VIOLATIONS OF THE FALSE CLAIMS ACT**
**31 U.S.C. §§ 3729, et seq.**

129.    Relator incorporates paragraphs 1 through 128 of this complaint as though fully set forth herein.

130.    This count sets forth claims for treble damages, penalties and other damages as provided for under the federal False Claims Act, 31 U.S.C. §§ 3729-3732, as amended.

131.    As the largest provider of network hardware, software, and support services to the United States military, Defendant Cisco entered into the JELA to provide maintenance and value-added services to any eligible component of the DoD.  Cisco obtained the contract by mirroring it after the already-existing Army ESA, which had great operational success using a points system to administer the value-added services.  However, under the JELA, Cisco secretly manipulated the value of the points and massively reduced the services available to the DoD, while increasing its profit margins.  Cisco produced and provided Mission Support Requests which reflected the manipulated point values without disclosing the fraudulent bases for the increase in point cost or the relationship of the points to the actual commercial market value of the service.  Cisco's manipulations would have been material to the United States' decision to enter into the JELA and/or reauthorize or renegotiate option years of the JELA and/or make any payments to the Defendant pursuant to the JELA.

132.    By engaging in this conduct, Defendant knowingly submitted false claims to the United States of America through the enrolled components of the DoD, including the Army.

133.    In doing so, Defendants knowingly violated:

a.      31 U.S.C. § 3729(a)(1)(A) by presenting or causing to be presented false or fraudulent claims for payment of approval; and

b.      31 U.S.C. § 3729(a)(1)(B) by making, using, or causing to be made or used, a

false record of statement to get a false or fraudulent claim paid or approved by the

United States.

134.    Because of the false or fraudulent claims made by Defendant, the United States

has suffered and continues to suffer damages and is therefore entitled to recovery as provided by

the False Claims Act of three times the amount of damages sustained by the United States, plus a

civil penalty of $5,500 to $11,000 for each violation.

**COUNT II:**
**VIOLATIONS OF THE FALSE CLAIMS ACT'S**
**ANTI-RETALIATION PROVISION**
**31 U.S.C. § 3730(h)**

135.    The allegations in paragraphs 1 through 134 are incorporated as though fully set

forth herein.

136.    Under the False Claims Act, 31 U.S.C. § 3730(h), an employee who, because of

his efforts to stop one or more violations of the False Claims Act, faces adverse employment

action or discrimination, is entitled to relief.

137.    As alleged herein, the Relator engaged in lawful acts in furtherance of his efforts

to stop conduct in violation of 31 U.S.C. § 3729.  Defendant Cisco was on notice of the Relator's

objections to Defendant's practices.  As a direct result of his efforts to convince Defendant to

change its conduct, Defendant retaliated against the Relator: he was threatened, intimidated,

demoted, and ultimately terminated.

138.    As a direct and proximate result of the actions of Defendant Cisco, Relator lost

the benefits and privileges of employment and has suffered continuing damage to his otherwise

illustrious and successful career.  He is entitled to all relief necessary to make him whole,

including two times the amount of back pay, interest on the back pay, and compensation for

40

special damages sustained as a result of the retaliation, including litigation costs and reasonable attorneys' fees.

## PRAYER FOR RELIEF

Wherefore, Relator Michael Campbell respectfully prays for judgment against Defendant Cisco Services, Inc. as follows:

A.     That the Court enter judgment against Defendant and order that it cease and desist from violating 31 U.S.C. §§ 3729, *et seq.*, immediately;

B.     That the Court enter judgment against Defendant in an amount equal to three times the amount of damages that the United States has sustained because of Defendant's actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each claim submitted in violation of 31 U.S.C. § 3729;

C.     That the Court enter judgment against Defendant for wrongful retaliation pursuant to 31 U.S.C. § 3730(h) and award Relator two times his back pay, with interest, and compensation for special damages including litigation costs and reasonable attorneys' fees;

D.     That the Court enter judgment against Defendant for the costs of this action, with interest, including costs to the United States for its expenses related to this action;

E.     That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act;

F.     That the United States and Relator receive all relief, both at law and in equity, to which they may be reasonably entitled; and

G.     That the Court order any other relief which it deems to be appropriate and just.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator Michael Campbell

demands a trial by jury on all issues so triable.

Respectfully submitted, this 2nd day of January, 2018.

<table>
<tr><td>/s/ Lynne Bernabei<br>Lynne Bernabei<br>DC Bar No. 938936<br>Kristen Sinisi<br>DC Bar No. 1033075<br>Bernabei & Kabat, PLLC<br>1400 16th Street, NW<br>Suite 500<br>Washington, D.C. 20036-2223<br>Phone: (202) 745-1942<br>Fax: (202) 745-2627<br>bernabei@bernabeipllc.com<br>sinisi@bernabeipllc.com</td><td>/s/ Frederick M. Morgan, Jr.<br>Frederick M. Morgan, Jr.<br>Ohio Bar No. 0027687<br>Jennifer M. Verkamp<br>Ohio Bar No. 0067198<br>Sonya A. Rao<br>Massachusetts Bar No. 647170<br>Morgan Verkamp LLC<br>35 East 7th Street, Suite 600<br>Cincinnati, Ohio 45202<br>Phone: (513) 651-4400<br>Fax: (513) 651-4405<br>rick.morgan@morganverkamp.com<br>jverkamp@morganverkamp.com<br>sonya.rao@morganverkamp.com</td></tr>
</table>